## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:18-cr-00098-JAW-06 |
| | ) | |
| MALCOLM GREENLAW | ) | |

### ORDER ON MOTION FOR COMPASSIONATE RELEASE

A defendant moves for compassionate release to home confinement and a period of supervised release under 18 U.S.C. § 3582(c)(1)(A)(i). Though the defendant's type-2 diabetes and other medical conditions present a case for compassionate release, the Court concludes the likelihood he will reoffend, along with the short amount of time he has served, the need for rehabilitation, and principles of just punishment and deterrence, caution against release. The Court denies the motion.

## I. PROCEDURAL BACKGROUND

On July 29, 2019, the Court sentenced Malcolm Greenlaw to forty-eight months of imprisonment, three years of supervised release, no fine, and a $100 special assessment for conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C). *Am. J.* (ECF No. 306).

On July 20, 2020, Mr. Greenlaw filed a *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *Def.'s Mot. for Compassionate Release* (ECF No. 368) (*Def.'s Mot.*). On July 22, 2020, Mr. Greenlaw was appointed counsel, *Order Appointing Attorney Hunter J. Tzovarras to Represent Def. Malcolm Greenlaw on His*

*Pro Se Mot. for Compassionate Release* (ECF No. 371), and on July 31, 2020, Mr. Greenlaw filed an unopposed motion to extend time to file an amended petition, *Unopposed Mot. to Extend Time to File Am. Pet. for Compassionate Release* (ECF No. 377), which the Court granted on August 3, 2020. *Order Granting Mot. to Extend Time* (ECF No. 378). On August 7, 2020, Mr. Greenlaw moved to proceed on his initial petition and attached additional exhibits in support of the petition. *Def.'s Mot. to Proceed on Initial Pet.* (ECF No. 380). On August 14, 2020, the Government moved to extend time to respond to Mr. Greenlaw's petition, *Unopposed Mot. to Extend Time to Respond to Mot. for Compassionate Release* (ECF No. 389), which the Court granted on August 17, 2020. *Order Granting Mot. to Extend Time to File Resp.* (ECF No. 390). On August 17, 2020, the Government responded in opposition. *Gov't's Opp'n to Def.'s Mot. for Compassionate Release Re: First Step Act* (ECF No. 391) (*Gov't's Resp.*). Mr. Greenlaw filed a reply on August 21, 2020. *Def.'s Reply to Gov't's Opp'n to Pet. for Compassionate Release* (ECF No. 394) (*Def.'s Reply*).

## II.   POSITIONS OF THE PARTIES

### A.   Malcolm Greenlaw's Motion[1]

Mr. Greenlaw asks that the Court "reduce his sentence to time served, followed by supervised release, with condition of home confinement for whatever portion of that time the Court deems appropriate" due to his "serious health condition and the

---

[1]   On August 7, 2020, Mr. Greenlaw filed a supplemental motion stating he "intends to proceed on the initial petition for compassionate release." *Def.'s Mot. to Proceed on Initial Pet.* He attached to it several exhibits relating to his post-release plan, his medical records from the BOP, information regarding COVID-19, and information regarding his prisoner status at FCI Allenwood Medium. The Court considers Mr. Greenlaw's original motion and his supplemental motion attaching exhibits here.

threat that COVID-19 poses to his wellbeing." *Def.'s Mot.* at 1. He first discusses his situation in prison, stating that he is with "approximately 30 other inmates" and is "locked in his cell 23 hours a day." *Id.* He claims this is "essentially isolation, considered by many to be inhumane and typically reserved for the worst of the worst" and is "certainly not the environment this court envisioned when sentencing Mr. Greenlaw." *Id.*

Mr. Greenlaw argues that extraordinary and compelling reasons exist to justify a reduction in his sentence because he has serious medical conditions that "put him at risk for severe and possibly fatal" illness should he contract COVID-19. *Id.* at 3. This is because he suffers from type-2 diabetes and high blood pressure. *Id.* He states that the "CDC has identified several groups that have an increased risk of severe illness from COVID-19" including "people of any age who have a severe heart condition like hypertension, and diabetes." *Id.* at 4. Therefore, he claims to "check nearly every box" for determining whether someone is at high risk from COVID-19. *Id.*

Mr. Greenlaw admits that at the time of his motion "[FCI] Allenwood reports no cases of COVID-19," but argues the Bureau of Prisons (BOP) is "gaming the numbers" by removing any case where an inmate or staff member has recovered. *Id.* Despite the low numbers, Mr. Greenlaw argues that there is little testing at FCI Allenwood Medium, suggesting that the real numbers are actually higher. *Id.* at 4-5. He casts doubt on FCI Allenwood Medium's numbers, stating "it would be foolish

to assume that Allenwood FCI has magically found—and then kept secret—the cure to spreading this deadly virus." *Id.* at 5.

Mr. Greenlaw next argues that the § 3553(a) factors also weigh in favor of his release. *Id.* He argues "the Court must consider the most updated picture of defendant's history and characteristics which 'shed' light on the likelihood that the defendant will engage in future criminal conduct." *Id.* at 5-6. In terms of his treatment, he argues that he participated in a drug rehabilitation program in prison but "at this point his treatment needs are best met by permitting him to home confinement." *Id.* at 6. He contends that home confinement would be better because probation can refer him to treatment services while on supervised release, and it is "likely that [he] will be deprived of the opportunity for programming for the remainder of his sentence" because his drug rehabilitation program has been halted due to COVID-19. *Id.* Upon release, he "plans to reside with his family and enact his veterans medical care." *Id.*

## B.   The Government's Response

The Government "recognizes that [Mr. Greenlaw's] diagnosis of Type 2 diabetes mellitus qualifies as an 'extraordinary and compelling reason' warranting his release" but opposes Mr. Greenlaw's motion because he "poses a significant danger to the public and the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against his release."[2] *Gov't Resp.* at 1. The Government first details

---

[2]    The Government "concedes that [Mr. Greenlaw] has exhausted the applicable administrative remedies prerequisite to filing the Motion." *Gov't Resp.* at 1; *see id.* at 6 ("There is no dispute that [Mr. Greenlaw] has exhausted his administrative remedies and been denied compassionate release by the BOP"). The Court agrees.

the background of Mr. Greenlaw's case, including his offense, the presentence report, his custody at FCI Allenwood Medium, and his motion for compassionate release. *Id.* at 1-6.

The Government next outlines the BOP's response to the COVID-19 pandemic. *Id.* at 6. Acknowledging that "COVID-19 is an extremely dangerous illness," the Government contends that "BOP has taken significant measures to protect the health of the inmates in its charge" and has an action plan in place to respond to the crisis. *Id.* at 6-7. Some of the measures include limiting the movement of inmates, issuing face masks, screening new inmates for COVID-19 exposure risk factors and symptoms, and drastically reducing access to BOP facilities. *Id.* at 7-8. The Government admits "[u]nfortunately and inevitably, however, some inmates have become ill, and more likely will in the weeks ahead," but the BOP must weigh these concerns against other "critical considerations." *Id.* at 10.

The Government specifically reviews the current conditions at FCI Allenwood Medium, a medium security federal correctional institution in Pennsylvania, arguing that "the conditions at FCI Allenwood are some of the best in the country." *Id.* It agrees with Mr. Greenlaw that there are no reported cases of COVID-19 at the prison, but two current staff tested positive, and one staff member recovered. *Id.*

The Government "concedes that [Mr. Greenlaw] offers an 'extraordinary and compelling reason' warranting compassionate release due to his Type 2 diabetes mellitus." *Id.* at 14. However, it argues that he poses a significant danger to the community and the § 3553(a) factors weigh against his release. *Id.* at 14-15. The

Government points to Mr. Greenlaw's offense—conspiracy to distribute controlled substances including heroin and crack cocaine—as an 18 U.S.C. § 3142(g) factor that shows his danger to the community. *Id.* at 16. While he was merely a "middleman" in the drug conspiracy, "his role was nonetheless substantial." *Id.* The Government argues that because he "suffers from various physical and mental conditions, including those associated with his struggles with addiction," he has "no employment history or financial resources," and has "no discernible plan for what his post-release life might look like," his history and characteristics "provide no assurance of community safety in the event of his early release." *Id.* While his plans to continue with drug treatment are "obviously a good thing," Mr. Greenlaw still has nearly eight more months before he completes BOP's Residential Drug Abuse Program (RDAP), which the Government argues he should first complete. *Id.* at 16-17. The Government cautions the Court that considering the "correlation between the social distancing and quarantine measures arising from COVID-19 and increases in opioid drug abuse, overdoses, and deaths," releasing Mr. Greenlaw "could imperil the community to which he relocates." *Id.* at 17-18.

Finally, the Government weighs the applicable § 3553(a) factors and argues they "strongly disfavor a sentence reduction." *Id.* at 18. It again points to the seriousness of the drug offense and states that because Mr. Greenlaw has only been held in custody for "just over fifty percent of his forty-eight (48) month sentence," compassionate release "would undercut 'the seriousness of the offense'" and would neither "promote respect for the law," nor "provide just punishment," nor "afford

adequate deterrence." *Id.* at 19 (citing 18 U.S.C. § 3553(A)(2)(A)-(B)).   The Government also contends that Mr. Greenlaw's request for release "ignores the need to provide him 'correctional treatment in the most effective manner,'" which if completed, "could prove enormously beneficial to his post-release prospects." *Id.* at 19 (citing 18 U.S.C. § 3553(a)(2)(D)).

### C.    Malcolm Greenlaw's Reply

Mr. Greenlaw counters, first pointing to the Government's concession regarding exhaustion of administrative remedies and the extraordinary and compelling circumstances of his type-2 diabetes, stating that his "diabetes presents a possible death sentence if he contracts COVID within the BOP." *Def.'s Reply* at 1-4.

He next argues that he "does not pose a risk to the community if released early and placed on supervised release." *Id.* at 5.   While admitting that he "has a long history of drug addiction and been diagnosed with heroin dependency," he states that he has "taken steps to address his addiction since first being arrested," and "[h]is treatment and recovery can continue while on supervised release." *Id.* at 5-6.   He also points out that his criminal record did not start until he was forty years old, he has been "removed from the conspiracy for almost 4 years," and his prior criminal history was of "limited severity and does not raise alarm as to danger to the community." *Id.* at 6.   He argues he has "demonstrated an extraordinary acceptance of responsibility from the start" and that "[t]his acceptance of responsibility and severing the ties to his prior criminal conduct all weigh against Mr. Greenlaw posing a future risk to the community." *Id.* at 7.

## III.   LEGAL STANDARD

18 U.S.C. § 3582(c)(1)(A)(i) states:

> The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . ..

Where such a motion is properly before a court, the court must determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . .." *Id.*

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[3]   The Guidelines note that the movant must meet the "requirements of subdivision (2) . . .." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018).   Subdivision (2) provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . .."

---

[3]   The Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique circumstances presented by a global pandemic.   Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion.

Section 3142(g) sets forth the factors a court must consider before releasing a person pending trial and these standards are incorporated into the assessment of a request for compassionate release. They include (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). Regarding the history and characteristics of the person, the statute provides that the court must consider:

> (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . ..

18 U.S.C. § 3142(g)(3)(A-B).

Once a court has made its dangerousness determination, § 1B1.13 provides that the court should determine whether "extraordinary and compelling reasons" exist to release the defendant. U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). The policy statement provides that "extraordinary and compelling reasons" may exist under any of the following circumstances:

> (A)    **Medical Condition of the Defendant.**—

(i)     The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

  (I)    suffering from a serious physical or medical condition,

  (II)   suffering from a serious functional or cognitive impairment, or

  (III)  experiencing deteriorating physical or mental health because of the aging process,

  that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)  **Age of the Defendant.**—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)  **Family Circumstances.**—

(i)     The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)  **Other Reasons.**—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 cmt. n.1(A-D).   The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* § 1B1.13 cmt. n.2.   Finally, the policy statement states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* § 1B1.13 cmt. n.3.

The movant has the burden of showing entitlement to a sentence reduction, and "the Court 'has broad discretion in deciding whether to grant or deny a motion for sentence reduction.'" *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citation omitted)).

## IV.   FACTUAL BACKGROUND

### A.   The Presentence Investigation Report

In sentencing Mr. Greenlaw, the Court relied upon a Second Revised Presentence Investigation Report (PSR) prepared by the United States Probation Office (PO).[4]

#### 1.   Malcolm Greenlaw's History and Characteristics

Mr. Greenlaw is a forty-nine-year-old male born in Portsmouth, New Hampshire. *Restricted U.S. Probation Filing*, Attach. 2, *Second Revised Presentence Investigation Report* (ECF No. 370) (*PSR*) at 3.   Mr. Greenlaw's mother lives in New

---

[4]      A transcript of the sentencing proceedings has not been filed with the Court.

Brunswick, Canada and is a retired secretary, and his father lives in Whitefield, Maine and is retired from the United States Army and United States Postal Service. *Id.* ¶ 39. His parents divorced around 1972 or 1973. *Id.* He is reportedly "very close" to his mother but has had no contact with his father in the past six or seven years. *Id.* His mother began a romantic relationship with a man named Tony Madore in approximately 1978, but they separated around 1992 or 1993. *Id.* Mr. Greenlaw reported that Mr. Madore "physically abused him and his mother for nine or ten years" and Mr. Madore was an "abusive alcoholic." *Id.* ¶ 40. The abuse "started with hand strikes but escalated to punching [Mr.] Greenlaw with his knuckles on [Mr.] Greenlaw's head." *Id.* He also has a stutter for which he was bullied. *Id.*

Mr. Greenlaw grew up in New Hampshire until he was about six years old, when his family relocated to Canada. *Id.* ¶ 41. He lived in Canada for about ten years before moving to Berwick, Maine, at the age of sixteen. *Id.* He has since resided in southern Maine. *Id.* Immediately before his arrest in the offense at issue here, he "had been homeless for approximately one month" and previously lived in "various hotels/residences in Bangor for a few months." *Id.*

School records show Mr. Greenlaw attended Noble High School in North Berwick, Maine until his senior year but did not receive a diploma because he did not have enough credits. *Id.* ¶ 47. Mr. Greenlaw, however, reported that he did graduate. *Id.* Mr. Greenlaw enlisted in the United States Air Force in March 1991 and was administratively separated with an honorable discharge in November 1991 after being diagnosed with "adjustment disorder with depressed mood which, according to

12

the evaluating psychiatrist, would significantly interfere with [Mr.] Greenlaw's ability to function in the military environment." *Id.* ¶ 48. The PSR reveals sporadic employment, including Complete Labor and Staffing in Portland, Maine, Labor Ready in Portland, Maine, Velcro USA Inc. in Manchester, New Hampshire, and Shaw's grocery store. *Id.* ¶¶ 50-53. The PSR notes that "[a]ny gaps in employment in the last ten years are presumed to be a result of either unemployment or incarceration." *Id.* ¶ 49.

Mr. Greenlaw married Christina Mitchel in 1995 and they had two children. *Id.* ¶ 42. The two divorced in 1996 or 1997. *Id.* The children were adopted by Ms. Mitchel's new husband, and Mr. Greenlaw has not had contact with those children for several years. *Id.* Mr. Greenlaw married Kristine Flaherty in 1998 and they had two children together. *Id.* They divorced in 2009. *Id.* One child lives with Ms. Flaherty and has not spoken with Mr. Greenlaw in a few years, and the other child lives with her grandmother but speaks with Mr. Greenlaw "a couple times weekly." *Id.* He has been in a romantic relationship with Sammantha Johnson since 2016.[5] *Id.*

According to the PSR, at the time of sentencing, Mr. Greenlaw said he was 5' 8" tall and weighed around 160-170 pounds. *Id.* ¶ 43. He reported that he has spina bifida or degenerative disc disease which causes neck pain, and records from Eastern Maine Medical Center in Bangor from 2014 confirm his cervical spine showed "fairly

---

[5]      Ms. Johnson was a co-defendant in this drug trafficking conspiracy and on January 7, 2020, the Court sentenced her to thirty months of incarceration, three years of supervised release, no fine and a $100 special assessment. *J.* (ECF No. 356).

extensive degenerative changes with narrowing C5-C6 and C6-C7 disc spaces with fairly large anterior and lateral hypertrophic spurring." *Id.* Records from Hope House in Bangor show Mr. Greenlaw was diagnosed with "cervical radiculopathy, caffeine excess, phimosis, Raynaud's syndrome, hyperlipidemia, and neck pain" in 2014. *Id.*

Regarding mental health, the PSR reflects a history of depression and other issues. *Id.* ¶ 44. Mr. Greenlaw reported having anxiety, depression, paranoia, and post-traumatic stress disorder. *Id.*

Mr. Greenlaw has a history of substance abuse. He reported that he began consuming alcohol when he was between twelve and thirteen years old, he last consumed it in May 2018, and his consumption was "really problematic" in 2008. *Id.* ¶ 45. Around age fourteen or fifteen, he first consumed marijuana, which he last used around 2017. *Id.* He used cocaine first in 2012 and last in July 2018, and at the height, he used it a couple days per week. *Id.* Five years ago, he began using heroin and last used it in July 2018, a few days before his arrest for the offense here. *Id.* According to Portsmouth Hospital records, Mr. Greenlaw was diagnosed with alcohol dependence in 2012 and underwent treatment. *Id.* ¶ 46. In 2016, he was diagnosed with heroin dependence and participated in methadone treatment at Discovery House in Bangor from April 2017 until November 2017. *Id.* While awaiting sentencing in this case, he was engaged in "NA and AA classes" at Somerset County Jail. *Id.*

14

### 2.    Criminal History

This was not Mr. Greenlaw's first encounter with the judicial system.  His driver history records show that when he was twenty-seven years old, he was convicted for operating after suspension.  *Id.* ¶ 26.  He had no criminal history until age forty, when he was found guilty for criminal trespass after he entered an apartment without license or privilege.  *Id.* ¶ 27.  When he was forty-two years old, he was fined for assault after he yelled at, pushed, kicked, and threw a shoe and cellular phone at Sammantha Johnson, his live-in fiancé.  *Id.* ¶ 28.  At age forty-three, he was incarcerated for forty-eight hours when he violated a condition of release by consuming alcohol and having contact with Ms. Johnson.  *Id.* ¶ 29.  Police records reflect he and Ms. Johnson had an argument while he was on bail for a domestic charge and had active conditions including no contact with Ms. Johnson or use or possession of alcohol.  *Id.*  Also when he was forty-three, he was incarcerated for ten days for domestic violence assault and violating a condition of release stemming from an altercation with Ms. Johnson.  *Id.* ¶ 30.  At age forty-four, he was fined for criminal trespass for being in an abandoned building that had a clearly posted "No Trespassing" sign on the door.  *Id.* ¶ 31.  When he was forty-five years old, he was incarcerated for thirty days and fined for unlawful possession of scheduled drug, criminal mischief, possession of hypodermic apparatuses, and violating condition of release after police officers found drugs in Mr. Greenlaw's and Ms. Johnson's hotel room.  *Id.* ¶ 32.  When he was forty-six years old, he was incarcerated for five days and fined for unlawful possession of scheduled drugs and violating condition of

release after he and Ms. Johnson were found sleeping in a vehicle that contained heroin and other drug paraphernalia. *Id.* ¶ 33. Also at age forty-six, Mr. Greenlaw was incarcerated for five days and fined when he was found in possession of heroin and suboxone. *Id.* ¶ 34.[6]

Mr. Greenlaw was scored as a Criminal History category III. *Id.* ¶ 35.

### 3. Nature and Circumstances of the Offense

#### a. Count One: Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances

No later than October 2015, law enforcement began investigating a drug trafficking organization (DTO) led by Luis Padilla in Penobscot County, Maine. *Id.* ¶ 4. The investigation, which involved controlled buys, surveillance, and confidential sources, revealed the DTO was transporting large quantities of cocaine base and heroin from Waterbury, Connecticut to Penobscot County for distribution and used several "trap houses" to facilitate the distribution. *Id.* ¶¶ 1, 4. The DTO had several "runners" who distributed drugs for the DTO and were compensated with money and/or drugs. *Id.* ¶ 4.

---

[6]    In addition to these convictions, in 2014, Mr. Greenlaw had a domestic violence assault charge, another altercation with Ms. Johnson, dismissed. *Id.* ¶ 36. In 1991, he was arrested for burglary and possession of bad check/money order, but the disposition is unknown, and in 2016, aggravated trafficking and trafficking of a Schedule W drug, but prosecution was declined. *Id.* ¶¶ 38, 37A. These charges and dismissals did not count for purposes of establishing his criminal history category. In *United States v. Marrero-Pérez*, 914 F.3d 20 (1st Cir. 2019), the First Circuit wrote that "as a matter of judicial policy, in this case and henceforth, no weight should be given in sentencing to arrests not buttressed by convictions or independent proof of conduct." *Id.* at 22. It is not clear whether the First Circuit's prohibition extends to a motion for compassionate release. *See United States Díaz-Rivera*, 957 F.3d 20, 26-27 (1st Cir. 2020) (discussing *Marrero-Pérez*). Given the age of one dismissed charge, the fact the charges resulted in dismissals, and his otherwise-established criminal history category, the Court has not considered these dismissed charges in resolving the motion for compassionate release.

The DTO initially made weekly resupply trips to Connecticut, but the quantity of the trips decreased as the DTO started purchasing more drugs at a time. *Id.* ¶¶ 6-7. Initially, the DTO would bring back two hundred grams of heroin and two hundred grams of cocaine base on the resupply trips, but it increased to six hundred grams to one kilogram of each heroin and cocaine base. *Id.*

Mr. Greenlaw was a "runner" and middleman for drug deals between co-conspirators and the customers, and he also had customers of his own to whom he would distribute drugs which he orchestrated by telephone/text message. *Id.* ¶ 4. He distributed drugs from local hotels and residences, and he provided transportation to co-conspirators so they could distribute drugs. *Id.* In exchange for drugs, he provided transportation for co-conspirators to Connecticut to bring resupplies of drugs back to Maine for the conspiracy to distribute. *Id.* He and Sammantha Johnson went on most weekly resupply trips, where they would transport drugs from Connecticut. *Id.* ¶¶ 5-6. They would also coordinate drug deals if customers contacted them. *Id.* ¶ 5.

On July 18, 2018, Mr. Greenlaw was named in Count 1 of a two-count indictment filed in the U.S. District Court in Bangor, Maine, charging him with Conspiracy to Possess with Intent to Distribute Controlled Substances, and on July 23, 2018, he was arrested pursuant to a federal arrest warrant. *Id.* ¶ 1. The day of his arrest, he had his initial appearance and arraignment before Magistrate Judge Nivison, where he tendered a not guilty plea which was accepted by the Court. *Id.* On August 2, 2018, the Magistrate Judge ordered Mr. Greenlaw detained pending trial. *Id.* On January 10, 2019, Mr. Greenlaw appeared before the Court and,

pursuant to a written plea agreement, tendered a guilty plea to Count 1 of the indictment, which was accepted by the Court. *Id.* The Court ordered him detained pending sentencing. *Id.*

The Probation Office held Mr. Greenlaw accountable for two resupply trips based upon each trip containing two hundred grams of each cocaine base and heroin for a total of four hundred grams of each heroin and cocaine base. *Id.* ¶ 10. Pursuant to U.S. Sentencing Guidelines Manual § 2D1.1, comment [n.8(D)], Mr. Greenlaw was found accountable for 1,828.40 kilograms of converted drug weight. *Id.*

### b.   Guideline Calculations

The Court calculated a total offense level of twenty-seven and a Criminal History Category of III for a guideline range of 87 to 108 months,[7] a supervised release range of one to three years, a fine range of $25,000 to $1,000,000, and a special assessment of $100. *Restricted U.S. Probation Filing*, Attach. 1, *Statement of Reasons*.

---

[7]   For practical purposes, the guideline range was 70 to 87 months. This bears a word of explanation. The First Step Act, 18 U.S.C. § 3553(f), among other things, liberalized the availability of the so-called Safety Valve provisions, U.S.S.G. § 2D1.1(b)(18) and § 5C1.2(a)(5), and the more lenient provisions would have accorded Mr. Greenlaw a two-level reduction, reducing his guideline range from 87 to 108 months to 70 to 87 months. However, at the time, the United States Sentencing Commission was without a quorum and unable to amend the guidelines to conform with the statute. Accordingly, even though (with agreement of counsel), the Court found that the guideline range was 87 to 108 months under the existing guideline provisions, the Court varied downward two levels to accord Mr. Greenlaw the benefit of the same guideline range he would have received if the Commission had promulgated a revision of the guidelines to mirror the provisions of the First Step Act.

## V.    DISCUSSION

The Court first addresses Mr. Greenlaw's motion using the criteria of the applicable statutes and Guidelines and then reviews whether he has otherwise made the case for compassionate release.

### A.    Danger to the Community

Any reduction in sentence must be "consistent with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. § 3582(c)(1)(A). Relevant here, the United States Sentencing Commission issued a policy statement that states the movant must meet the "requirements of subdivision (2)," which provides that the Court must determine "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . .." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Thus, notwithstanding any extraordinary and compelling reasons for Mr. Greenlaw's release, the Court must determine that he is not a danger to the community.

The Government argues that Mr. Greenlaw has "failed to meet his burden of showing that, if released, 'the safety of any other person and the community' would reasonably be assured" and thus he poses a danger to the community.  *Gov't's Resp.* at 16 (citing 18 U.S.C. § 3142(g)).  Mr. Greenlaw argues that supervised release and "substance abuse treatment within the community" "assure" that he will not relapse into criminal conduct.  *Def.'s Reply* at 5.  Mr. Greenlaw further points to the steps he has taken to address his addiction, the long period of time that has passed since his

involvement in the conspiracy, the "limited severity" of his prior criminal history, and his "extraordinary acceptance of responsibility." *Id.* at 5-7.

Weighing the § 3142(g) factors, the Court determines that Mr. Greenlaw poses a sufficient danger to the community to prevent his compassionate release. Mr. Greenlaw's offense involved trafficking heroin and cocaine as part of a larger interstate conspiracy. Although he was not a leader or supervisor of the conspiracy, he was accountable for 1,828.40 kilograms of converted drug weight, and in addition to transporting drugs from Connecticut to Maine, he coordinated his own drug deals. This Court, like other courts, finds these are serious offenses. *See United States v. Brinson*, Criminal No. 15-87, 2020 U.S. Dist. LEXIS 146341, at *15 (W.D. Pa. Aug. 14, 2020) (denying compassionate release and observing that "heroin trafficking poses a substantial risk of harm to the community"); *United States v. Walker*, Case No.: 2:17-CR-539-RDP-SGC, 2020 U.S. Dist. LEXIS 161352, at *11 (N.D. Ala. Sept. 3, 2020) (concluding that despite its non-violent nature, because the defendant's offense involved "significant amounts" of heroin, defendant posed a danger to the community); *see also United States v. Brady*, S2 18 Cr. 316 (PAC), 2020 U.S. Dist. LEXIS 86349, at *7-8 (S.D.N.Y. May 15, 2020) (denying compassionate release for a defendant who "conspired to sell controlled substances into the very teeth of a nationwide opioid epidemic that ravaged our country well before the arrival of COVID-19, and which continues to take its cruel toll alongside the virus").

Furthermore, Mr. Greenlaw acknowledges that he "has a long history of drug addiction" and "his involvement in the past conspiracy was started in order to obtain

drugs for himself," *Def.'s Reply* at 5-6, but Mr. Greenlaw has not demonstrated what steps he intends to take to ensure he does not return to his past criminal behavior. Beyond living with his brother in Maine and "enact[ing] his veterans medical care," *Def.'s Mot.* at 6, it is unclear what his post-release life might look like. In its amended judgment, the Court recommended Mr. Greenlaw's "enrollment in the 500 Hour Comprehensive Drug Treatment Program." *Am. J.* at 2. The Court commends Mr. Greenlaw's participation in the BOP's drug rehabilitation program, RDAP, but he is only in "the program's phase 1 of 3" and he still has about eight more months to go before he completes the program, with a "tentative completion date of April 15, 2021."[8] *Gov't's Resp.*, Attach. 1, *Decl. of BOP Unit Manager Matthew Nicholas.* The Court agrees with the Government that completion of the RDAP "could prove enormously beneficial to [Mr. Greenlaw's] post-release prospects." *Gov't's Resp.* at 19.

To be clear, however, the Court does not view Mr. Greenlaw's participation in the RDAP, although beneficial, as a valid reason, standing alone, to deny his motion for compassionate release. In *Tapia v. United States*, 564 U.S. 319 (2011), the United States Supreme Court concluded that under 18 U.S.C. § 3553(a), a sentencing court should not increase a defendant's sentence in order to allow the defendant to participate in rehabilitation, noting that "imprisonment is not an appropriate means of pursuing that goal." *Id.* at 328; *Henderson v. United States*, 568 U.S. 266, 270

---

[8]     Mr. Greenlaw argues that "if he remains incarcerated . . . it is likely that [he] will be deprived of the opportunity for programming for the remainder of his sentence, since BOP facilit[ies] have [] halted programming and are on a lockdown status due to COVID-19." *Def.'s Mot.* at 6. The Government, however, attaches a declaration from a unit manager for the BOP stating that Mr. Greenlaw is "not being deprived of drug programming" and that the RDAP "is currently operating on a modified schedule." *Id.* at ¶¶ 3-4. The Court finds that Mr. Greenlaw may continue to participate in the RDAP at FCI Allenwood Medium.

(2013) (In *Tapia* "we held that it is error for a court to 'impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation'") (quoting *Tapia*, 564 U.S. at 335); *United States v. López-Delgado*, No. 18-1952, 2020 U.S. App. LEXIS 27665, at *18, n.1 (1st Cir. Aug. 13, 2020); *United States v. Vázquez-Méndez*, 915 F.3d 85, 87-88 (1st Cir. 2019). It is not clear that the *Tapia* holding applies to an incarcerated defendant's motion for compassionate release, where the burden is on a defendant to demonstrate that an early release would meet statutory and guideline criteria, and there is a difference between imposing an original sentence and releasing a defendant early from an already imposed sentence.

Even under *Tapia*, as construed by the First Circuit, a court may consider rehabilitation in a limited way in determining a defendant's initial sentence. In 2014, the First Circuit clarified that a court may consider rehabilitation among a "myriad" of factors, so long as rehabilitation was not the "driving force" behind or "dominant factor" in the length of the sentence. *Vázquez-Méndez*, 915 F.3d at 87-88 (quoting *United States v. Del Valle-Rodríguez*, 761 F.3d 171, 174-75 (1st Cir. 2014)). As the Court explains, the way it views Mr. Greenlaw's RDAP participation is in the context of his prior criminal history and his risk of recidivism. Here the Court has considered RDAP as one factor along with others in ruling on Mr. Greenlaw's motion.

To explain, the Court turns to Mr. Greenlaw's criminal history. Although Mr. Greenlaw characterizes his criminal history as of "limited severity," the Court disagrees. In the Court's view, Mr. Greenlaw has a significant criminal history,

resulting in his placement in Criminal History category III at sentencing.  *See supra Criminal History* (listing his criminal history).  Mr. Greenlaw has been convicted of multiple prior drug offenses as well as several domestic violence assaults.  For purposes of his proposed early release, it concerns the Court that he has several convictions for violating conditions of release.

Moreover, even though Mr. Greenlaw remained crime-free for most of his life, he made up for lost time when he reached his forties.  *PSR* ¶¶ 28-34.  By the Court's count, he was convicted of sixteen crimes from 2014 until July 23, 2018 when he was arrested for this federal crime.  By the Court's reckoning, eleven of these convictions were directly related to his drug and alcohol abuse, and most of his remaining convictions are consistent with his abuse of alcohol or drugs.  Given his track record, the Court is extremely concerned that if Mr. Greenlaw does not obtain an intensive course of drug and alcohol therapy, he will recidivate.  Even though such a course might be available on the outside, he has proposed none and the Court is chary about releasing him without his obtaining a greater understanding of his addictions, the causes of his addictive behavior, and the tools to avoid falling back into his old pattern of substance abuse and criminality.

Two final factors are just punishment and deterrence.  Mr. Greenlaw was deeply involved in a drug trafficking conspiracy, not only working for people supplying drugs to him, but also distributing drugs to others.  Mr. Greenlaw faced a guideline sentence range of 70 to 87 months and the Court imposed a lenient sentence of 48 months.  It is the Court's view that the 48-month sentence was and remains

appropriate as it reflected the seriousness of Mr. Greenlaw's criminal conduct, placed him away from the local influences that occasioned his substance abuse and criminal behavior for an extended interval, and sent a message to others that their involvement in sophisticated drug trafficking organizations would result in a significant period of incarceration. He has only been in prison for about twenty-five months of his forty-eight-month sentence. His early release would undercut each of these sentencing objectives.

During the sentencing hearing, Mr. Greenlaw made an impressive allocution. He informed the Court that he believes his arrest probably saved his life, that he was delusional, and had shrunk in weight to only 115 pounds. In his words, "me finally came back to me." The Court appreciates Mr. Greenlaw's acceptance of responsibility but finds this does not outweigh the other factors bearing on danger to the community. The Court therefore concludes that considering the nature of Mr. Greenlaw's offenses and his criminal history, the need to complete the BOP's RDAP, and the need to impose a just punishment and to deter others, Mr. Greenlaw poses a sufficient danger to the community to bar compassionate release.

## B.    The 3553(a) Factors

The Court has already laid out the nature and circumstances of Mr. Greenlaw's offense, his history and characteristics, and the Court's belief—at the time of sentencing and today—that Mr. Greenlaw's sentence was necessary both to reflect the seriousness of Mr. Greenlaw's crime and to protect the public from future crimes by him. The Court's analysis of the sentencing factors in 18 U.S.C. § 3553(a) has not

changed since it sentenced Mr. Greenlaw. To the extent Mr. Greenlaw argues his current confinement is "inhumane" and "not the environment this court envisioned when sentencing" him, *Def.'s Mot.* at 1, the Court agrees with Mr. Greenlaw that it had not envisioned a global pandemic when it sentenced him; nevertheless, the BOP implemented restrictive safety measures to ensure its prisons remain free of COVID-19. Thus, weighing the factors, the Court maintains that Mr. Greenlaw's sentence was necessary to reflect the seriousness of his crime and to protect the public from future crimes by him, and was no more or less severe than necessary.

## C.      Extraordinary and Compelling Reasons

To grant Mr. Greenlaw's petition under 18 U.S.C. § 3582(c)(1)(A)(i), the Court must find "extraordinary and compelling reasons warrant[ing]" a reduction in sentence. The Court reviews Mr. Greenlaw's medical conditions and his risk of being infected with COVID-19.

### 1.      Malcolm Greenlaw's Medical Conditions

In Mr. Greenlaw's motion he identifies a number of medical problems and attaches a BOP list of his health problems. *See Def.'s Mot. to Proceed on Initial Pet.*, Attach. 2, *Bureau of Prisons, Health Services, Health Problems* (*BOP Health Problems Chart*). The Government also attaches over seventy pages of medical records to its response. *See Gov't Resp.*, Attach. 2, *Bureau of Prisons, Health Services Records* (*BOP Health Records*). Mr. Greenlaw makes the case that his poor health constitutes extraordinary and compelling circumstances. The Government agrees. *See Gov't Resp.* at 14 ("[T]he Government concedes that [Mr. Greenlaw] offers an 'extraordinary

and compelling reason' warranting compassionate release due to his Type 2 diabetes mellitus."). The Court independently examines Mr. Greenlaw's circumstances and finds that Mr. Greenlaw is at greater risk than the average inmate of suffering a severe illness should he contract COVID-19.

The Court begins with Mr. Greenlaw's age. The Center for Disease Control (CDC) has found that a person's "risk of getting severely ill from COVID-19 increases as [they] get older." *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Oct. 1, 2020). According to the CDC, "8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older." *Id.* However, Mr. Greenlaw is only forty-nine years old. *PSR* at 3. The Court does not find that Mr. Greenlaw's age—on its own or in combination with his other conditions—creates a basis for his compassionate release motion.

Mr. Greenlaw's other conditions, however, create a compelling case. In his motion, Mr. Greenlaw asserts that he has diabetes and high blood pressure, which is supported by the Government's records. *Def.'s Mot.* at 3; *see BOP Health Records*. His medical records from the BOP list many health problems: chronic viral hepatitis C, type-2 diabetes mellitus, vitamin D deficiency, hyperlipidemia, severe opioid use disorder, recurrent major depressive disorder, unspecified mood affective disorder, anxiety disorder, paranoid personality disorder, myopia, presbyopia, allergic rhinitis, gastro-esophageal reflux disease, and noncompliance with other medical treatment and regimen. *BOP Health Problems Chart*. The BOP medical

records provided by the Government confirm he has been diagnosed with type-2 diabetes mellitus and has been prescribed metFORMIN tablets and insulin injections. *BOP Health Records* at 4-5, 8, 10, 24-26, 41, 63, 72.

Mr. Greenlaw's type-2 diabetes is one of eight conditions the CDC lists as putting people of any age at increased risk of severe illness. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 1, 2020). Mr. Greenlaw is currently "prescribed metFORMIN tablets as well as insulin subcutaneously" to manage his diabetes. *Gov't Resp.* at 11; *see BOP Health Records.* Additionally, as Mr. Greenlaw has more than one underlying medical condition, the CDC says that "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 1, 2020).[9]

Based on the medical records in this case and CDC guidance, the Court finds that Mr. Greenlaw is at greater risk than the average inmate of suffering a severe illness should he contract COVID-19.

---

[9]     Mr. Greenlaw also claims to have hypertension. *See Def.'s Mot.* at 3-4. Hypertension or high blood pressure is listed as a condition that "might" put people at an increased risk for severe illness from COVID-19. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The medical records reflect various blood pressure readings, but do not explicitly state that he has hypertension and Mr. Greenlaw does not supply any further information to conclude that he has hypertension or high blood pressure. Therefore, the Court does not consider Mr. Greenlaw's claimed hypertension in its extraordinary and compelling reasons analysis.

### 2.    FCI Allenwood Medium and COVID-19

The Court turns to how likely it is that Mr. Greenlaw will contract COVID-19 while incarcerated.   While the Government conceded that Mr. Greenlaw's type-2 diabetes diagnosis offers an extraordinary and compelling reason warranting release, it argues that his diagnosis does not make it more likely that he will contract COVID-19 at FCI Allenwood Medium.   *Gov't's Resp.* at 15 n.7.   The Government argues that "notwithstanding [Mr. Greenlaw's] speculation to the contrary, the infection rates at FCI Allenwood's medium security facility are nearly non-existent." *Id.*   The Government also outlines the steps the BOP has taken to control the spread of COVID-19 in its facilities.   *Id.* at 6-10.   Some of these measures include severely limiting the movement of inmates and detainees, issuing face masks, screening newly admitted inmates for COVID-19 exposure risk factors and symptoms, isolating symptomatic inmates, and suspending social and legal visits.   *Id.*

The relevant data for purposes of evaluating Mr. Greenlaw's risk of contracting COVID-19 are the statistics from FCI Allenwood, a medium security federal correctional institution in Pennsylvania, where he is currently incarcerated. According to the BOP, there are 1,022 total inmates at FCI Allenwood Medium.   *See FCI Allenwood Medium*, BOP, https://www.bop.gov/locations/institutions/alm/ (last visited Oct. 1, 2020).   On July 20, 2020 when Mr. Greenlaw filed his motion, he stated there were "no reported cases of COVID-19."   *Def.'s Mot.* at 4.   The most recent statistics from FCI Allenwood reveal that twenty-seven inmates have now tested positive for COVID-19.   *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/

(last visited Oct. 1, 2020).  Six staff have tested positive and one staff member has recovered.  *Id.*  This puts FCI Allenwood at one of the highest infection rates of all BOP facilities.  *Id.*

Mr. Greenlaw argues that the BOP is "gaming the numbers" by "remov[ing] from its public listing any case where an inmate or staff member has recovered." *Def.'s Mot.* at 4.  He further contends the numbers are likely higher because only a small number of inmates have been tested, which "suggests that the infection rate is far larger than previously believed."  *Id.*  If the Court denies Mr. Greenlaw's motion based on the reported infection rate, he asks the Court to "first order the BOP to inform the Court of the number of COVID-19 test[s] performed at the facility."  *Id.* at 5.

Without more, based on Mr. Greenlaw's allegations alone, the Court has no reason to suspect that the BOP's numbers are suspect and appreciates the efforts the BOP has made to ensure the safety of its inmates and staff.  At the same time, Mr. Greenlaw is correct that the number of tests performed at FCI Allenwood Medium is small.  According to the BOP only 357 inmates at FCI Allenwood Medium have completed tests, with only two tests currently pending.[10]  *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited Oct. 1, 2020).  This means about one-third of the inmates at FCI Allenwood have been tested, and despite the BOP's best efforts, it is possible that the true number of infected inmates is higher.

---

[10]      The Court declines Mr. Greenlaw's request to order the BOP to inform the Court of the number of COVID-19 tests performed at FCI Allenwood Medium because the BOP already makes that information publicly available.  *See COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/.

### 3.     Maine versus FCI Allenwood Medium

COVID-19 continues to rage throughout the United States and the world, and if released, Mr. Greenlaw would not enter a world free from COVID-19.  One question is whether the risk from where he intends to reside is lower than the risk at FCI Allenwood Medium.  Given the defined risk presented by continued incarceration at FCI Allenwood Medium, the Court should assess whether the place where Mr. Greenlaw would live upon release would have a COVID-19 risk qualitatively and quantitatively different from FCI Allenwood Medium, what the extent of the difference is, and how the Court should factor this difference into its overall assessment.[11]

If released, Mr. Greenlaw says that he would live with his brother Daniel Greenlaw in Lebanon, Maine.  *Def.'s Mot.*, Attach. 1, *Proposed Home Confinement Address*.  From the record before the Court, however, it is difficult to compare the risks between Lebanon, Maine and FCI Allenwood Medium.  According to the state of Maine, there are 5,391 positive cases in the state of Maine, equating to a case rate of 40.3 per 10,000 people.  *Cumulative COVID-19 Cases by County*, Maine Center for Disease Control & Prevention, https://www.maine.gov/dhhs/mecdc/infectious-disease/epi/airborne/coronavirus/data.shtml (last visited Oct. 1, 2020).  York County, where Lebanon, Maine is located, currently has 1,199 positive cases for a case rate of 58.1 per 10,000 people.  *Id.*  This makes Maine one of the safest states in terms of

---

[11]     The Court recognizes, however, that this risk comparison is not dispositive.  *See United States v. Scott*, Criminal Action No. 19-cr-10144-ADB-1, 2020 U.S. Dist. LEXIS 143316, at *9 (D. Mass. Aug. 11, 2020) (finding the importance of weighing the risk between prison and the defendant's home to be "debatable").

positive cases. *United States COVID-19 Cases and Deaths by State*, CDC, https://covid.cdc.gov/covid-data-tracker/?fbclid=IwAR0aEgDL_HEHLINMcOhLf4oW3Z8-3zz_Xn4W-9Eihk1Fp1LA-eAGgTrj6HQ#cases (last visited Oct. 1, 2020).

The Court also notes that the COVID-19 situation in prisons is fundamentally different than in general society. *See Denbow v. Maine Dep't of Corr.*, No. 1:20-cv-00175-JAW, 2020 U.S. Dist. LEXIS 100003, at *10 (D. Me. June 8, 2020) ("People who live or work in prisons face a particularly acute threat of illness, permanent injury, and death, beyond that faced by the general public"); *United States v. Hansen*, Case No. 17-CR-50062, 2020 U.S. Dist. LEXIS 80494, at *5 (N.D. Ill. May 7, 2020) (stating that "if and when [COVID-19 enters an institution], it is likely to spread more quickly than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison environment and the constant influx of people coming and going from outside the prison, including correctional staff").

Mr. Greenlaw has not, however, presented the Court with enough information to meaningfully compare the quantum of risk presented by FCI Allenwood Medium and his proposed residence in Lebanon, Maine. Based on the record in this case, the Court finds that if released to home confinement, Mr. Greenlaw would have some degree of lower risk of contracting COVID-19 than he would have if he remained at FCI Allenwood Medium, but it is unable to quantify that reduced risk.

### D.      The Balance Weighs in Favor of Denying Malcolm Greenlaw's Motion

Mr. Greenlaw's medical conditions and the inherent danger of being incarcerated in BOP facilities at this time present a serious case for compassionate release.  However, the Court is unable to release Mr. Greenlaw because it finds he poses a risk to the community and completion of his sentence is necessary to allow him to fully benefit from his drug rehabilitation program.  On balance, Mr. Greenlaw has failed to prove his entitlement to compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  However, the Court is dismissing without prejudice Mr. Greenlaw's motion so that it is clear that if he wishes to do so, based on changed circumstances, he may file a new petition, having complied anew with administrative exhaustion requirements.

## VI.    CONCLUSION

The Court DISMISSES without prejudice Malcolm Greenlaw's Motion for Compassionate Release (ECF No. 368).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of October, 2020